[Cite as *State v. Jarrell*, 2025-Ohio-2280.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | | C.A. No. 31137 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| TIMOTHY S. JARRELL | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR-2023-04-1332-A |

DECISION AND JOURNAL ENTRY

Dated: June 30, 2025

SUTTON, Judge.

**{¶1}** Defendant-Appellant Timothy Jarrell appeals the judgment of the Summit County Court of Common Pleas. For the reasons that follow, this Court affirms.

I.

**Relevant Background Information**

**{¶2}** This appeal arises from incidents occurring on February 18, 2023, and February 19, 2023, involving Mr. Jarrell, his co-defendant Jessica Ashley Hutchins, and D.B., a victim of rape, sexual battery, assault, and theft.

**{¶3}** After an investigation, Mr. Jarrell was charged with one count of rape, in violation of R.C. 2907.02(A)(1)(c)/(B), a felony of the first degree; one count of sexual battery, in violation of R.C. 2907.03(A)(2)/(B), a felony of the third degree; and one count of assault, in violation R.C. 2903.13(A)/(C), a misdemeanor of the first degree. Ms. Hutchins was also indicted on charges of

rape and sexual battery, in addition to being indicted on charges of felony theft, and felony obstructing justice.

{¶4}    Mr. Jarrell and Ms. Hutchins pleaded not guilty to these charges and a joint jury trial followed for both defendants. The jury found Mr. Jarrell guilty of rape, sexual battery and assault.  The jury also found Ms. Hutchins guilty of rape, sexual battery, a reduced theft charge, and obstructing justice.

{¶5}    Mr. Jarrell was sentenced to an indefinite term of 10-15 years of incarceration, is required to register as a Tier III sex offender for life, and to pay restitution in the amount of $1,072.27.  Ms. Hutchins was also sentenced to an indefinite term of 10-15 years incarceration, is required to register as a Tier III sex offender for life, and to pay restitution in the amount of $1,192.72.[1]

{¶6}    Mr. Jarrell now appeals raising two assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

**THE TRIAL COURT ERRED IN ALLOWING ENTIRELY-SPECULATIVE TESTIMONY ABOUT DRUG FACILITATED SEXUAL ASSAULT, IN VIOLATION OF EVIDENCE RULES 401, 402, 702, 703, AND 704 OF THE OHIO RULES OF EVIDENCE, THE [FIFTH] AND FOURTEENTH AMENDMENTS OF THE OHIO CONSTITUTION, AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.**

{¶7}    In his first assignment of error, Mr. Jarrell argues the trial court erred in allowing the expert testimony of Jennifer Savitski, M.D., chair of the Department of Obstetrics and Gynecology at Cleveland Clinic Akron General and the medical director of the forensic nursing

---

[1] Ms. Hutchins has also appealed her convictions in C.A. No. 31134.

program called the PATH Center. Specifically, Mr. Jarrell challenged Dr. Savitski's testimony regarding drug-facilitated sexual assault alleging it is speculative in nature.

{¶8} "Trial courts have broad discretion in determining the admissibility of expert testimony, subject to review for an abuse of discretion . . . In general, courts should admit such testimony when material and relevant, in accordance with Evid.R. 702[.]." *Terry v. Caputo*, 2007-Ohio-5023, ¶ 16.

{¶9} Evid.R. 702 states, in relevant part:

A witness may testify as an expert if the proponent demonstrates to the court that it is more likely than not that all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

{¶10} The State qualified Dr. Savitski as an expert in this matter. Dr. Savitski testified about her personal knowledge regarding drug-facilitated sexual assault and its interplay with the metabolization of different types of drugs used in sexual assaults. The jury learned that Dr. Savitski did not examine D.B. and did not review D.B.'s medical records. As such, Dr. Savitski did not opine on whether D.B. was, in fact, a victim of a drug-facilitated sexual assault.

{¶11} Dr. Savitski explained:

drug-facilitated sexual assault is any time when a substance is used to either incapacitate or otherwise decrease the ability of a victim to kind of defend themselves or otherwise act in a way that they [] wouldn't normally act to rebuff any type of assault that they are experiencing.

> Although we use the term drug, it does not necessarily mean it is an illegal substance. It could be something legal like alcohol, also over-the-counter medications, too. But any type of substance that is used to incapacitate a victim.
>
> . . .
>
> So any type of thing that comes into our system is what we called metabolized. It doesn't matter what it is, whether it's something we drink, eat, drugs, foods, anything our bodies process that compounds [what] we take into our system, and we call that processing metabolizing.
>
> So different organs of our body will break those substances down, turn them into other things, and then eventually excrete portions of those substances though a variety of mechanisms, through our intestines, through our kidneys and through our liver.

Over Mr. Jarrell's counsel's objection, Dr. Savitski testified regarding State's Exhibits 49 and 50,[2] a report authored by Dr. Savitski regarding drug-facilitated sexual assault and a chart of commonly used sexual assault drugs, with their street and/or brand names, and their respective forensic detection windows in blood and urine. Dr. Savitski further explained, based upon the specific drug used, individuals could feel a range of effects such as being drunk, altered decision making, altered ability to respond, being completely unconscious, and having "no recollection of what happened whatsoever" due to a "significant impact on memory formation." Dr. Savitski indicated a negative drug test does not always mean that a substance or drug was not used to facilitate a sexual assault because testing does not cover all potential drugs that can be used and certain drugs, such as Gamma-hydroxybutyrate and Rohypnol, "are metabolized or cleared from the system fairly quickly." Thus, because certain drugs metabolize quickly, Dr. Savitski explained that practitioners examining a victim of a drug-facilitated sexual assault ask questions about whether an individual is feeling more intoxicated than typical after having a couple of drinks, if there are any gaps in the individual's memory from a certain point on, losing bowel or bladder control, and feeling ultra-

---

[2] Exhibits 49 and 50 were shown in court during Dr. Savitski's testimony but were not sent back to the jury.

low consciousness. Dr. Savitski explained how these types of experiences and/or behaviors are all red flags when examining a victim of a drug-facilitated sexual assault.

{¶12} Here, the record reveals D.B. was found by the police in the hallway of the Super 8 Motel after Mr. Jarrell and Ms. Hutchins left the scene. D.B. appeared to be extremely intoxicated and D.B. was unable to get up off the floor. D.B. was sobbing and could not explain to the police what had happened to her. D.B. also testified after taking a drink out of a water bottle with no label in Mr. Jarrell's vehicle that tasted like cinnamon, she only had flashes of memories of events that had occurred that evening with large gaps of time in between memories. Specifically, D.B. indicated after drinking the substance in Mr. Jarrell's vehicle, her next memory was walking out of the police station with her brother. D.B. also testified she had some memories of events in the hotel room, such as Mr. Jarrell grabbing her chin and throat and hitting the wall "hard." D.B. testified she did not consume a large enough amount of alcohol that would cause her to have the long memory lapses she experienced. Video footage from the bars and the Super 8 Motel shows D.B., extremely intoxicated, holding herself up on the bar with her arms, laying her head on the bar, falling down on the patio, and stumbling down the hallway of the motel. Additionally, Cristine Bailey, the sexual assault nurse examiner who treated D.B. in the emergency room, testified based on the "evidence and data" from D.B., including her lapses in memory, a drug-facilitated sexual assault kit, along with a traditional sexual assault kit and forensic examination, was performed. Nurse Bailey specifically testified about the report she took when D.B. was examined, and D.B.'s accounting of what happened:

> [D.B.]: We just drove. And I remember her asking them where they were going to, and [Mr. Jarrell] said Musketeers, a bar in Richfield. We were on the highway and it would take a while to get there. I remember driving for a while.
>
> From there it gets really- -I don't remember walking into the bar. And then when I called the bar today, she said we all had one beer and one shot.

And then the next thing I know I'm being arrested, I remember being thrown against a wall, but I used the card that's linked to my daughter's checking account.

. . .

And after a while, I swear I remember her grabbing [Mr. Jarrell's] hand and putting it on my boob, but I don't remember where.

. . .

[T]hat's really all I remember.

{¶13}   Based upon the specific record in this case, we cannot say the trial court abused its discretion in allowing Dr. Savitski's expert testimony regarding drug-facilitated sexual assault. Pursuant to Evid.R. 702, Dr. Savitski, a qualified expert in this subject-matter, testified about the metabolization of substances used in sexually based assaults and why a negative drug screen does not necessarily mean drugs or alcohol were not used in this type of sexual assault. Dr. Savitski explained she instructs medical practitioners to ask questions regarding victims' behaviors to determine if drug-facilitated sexual assaults have occurred. This information is beyond the knowledge or experience possessed by lay persons and Dr. Savitski's testimony is based on reliable scientific, technical, or other specialized information. Further, Dr. Savitski's expert opinion regarding the impact of certain types of substances and their metabolic rates reflects a reliable application of these scientific principles and methods to the specific facts of this case.

{¶14}   Accordingly, Mr. Jarrell's first assignment of error is overruled.

### ASSIGNMENT OF ERROR II

**[MR. JARRELL'S] CONVICTIONS FOR RAPE, IN VIOLATION OF SECTION [2907.02(A)(1)(c)] OF THE OHIO REVISED CODE, AND SEXUAL BATTERY, IN [VIOLATION] OF SECTION 2907.03(A)(2) OF THE OHIO REVISED CODE, ARE UNCONSTITUTIONAL AS IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS BASED ON INSUFFICIENT EVIDENCE, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.**

**{¶15}** In his second assignment of error, Mr. Jarrell argues his convictions for rape and sexual battery are not supported by sufficient evidence and against the manifest weight of the evidence. Specifically, Mr. Jarrell challenges whether the State proved that "*at the time [Mr. Jarrell] and D.B. had sex* she was incapacitated to the ability where she could not give consent." (Emphasis in original.) "[S]ufficiency and manifest weight are separate and distinct questions, and this Court has repeatedly noted that it is not appropriate to combine sufficiency and manifest weight arguments within a single discussion." *State v. Zappa*, 2022-Ohio-243, ¶ 6 (9th Dist.). *See* App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it fails to . . . argue the assignment separately in the brief[.]"). Nonetheless, in the interest of justice, we exercise our discretion to consider the merits of Mr. Jarrell's combined assignment of error.

**{¶16}** "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 2009-Ohio-6955, ¶ 18 (9th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins* at 390 (Cook, J. concurring.). For purposes of a sufficiency analysis, this Court must view the evidence in the light most favorable to the State. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not evaluate credibility, and we make all reasonable inferences in favor of the State. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). The evidence is sufficient if it allows the trier of fact to reasonably conclude that the essential elements of the crime were proven beyond a reasonable doubt. *Id*.

**{¶17}** As to manifest weight of the evidence, however, this Court has previously stated:

[i]n determining whether a criminal conviction is against the manifest weight of the evidence an appellate court must review the entire record, weigh the evidence and

all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins*, 78 Ohio St.3d at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).

{¶18}  An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340. "[W]e are mindful that the [trier of fact] is free to believe all, part, or none of the testimony of each witness." (Internal quotations and citations omitted.) *State v. Gannon*, 2020-Ohio-3075, ¶ 20 (9th Dist.). "This Court will not overturn a conviction on a manifest weight challenge only because the [trier of fact] found the testimony of certain witnesses to be credible." *Id.*

**Sufficiency**

{¶19}  Mr. Jarrell was found guilty of rape, in violation of R.C. 2907.02(A)(1)(c)/(B), and sexual battery, in violation of R.C. 2907.03(A)(2)/(B).  R.C. 2907.02 states, in relevant part:

> (A)(1) No person shall engage in sexual conduct with another when any of the following applies:
> . . .
> (c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

Further, R.C. 2907.03 states, in relevant part:

(A) No person shall engage in sexual activity with another; cause another to engage in sexual activity with the offender; or cause two or more other persons to engage in sexual activity when any of the following apply:

. . .

(2) The offender knows that the other person's, or one of the other persons', ability to appraise the nature of or control the other person's own conduct is substantially impaired.

"Sexual activity" means sexual conduct or sexual contact, or both. R.C. 2907.01(C). "Sexual conduct" means:

vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A). However, "substantial impairment" is not defined for purposes of this statute.

In *State v. Jordan*, 2023-Ohio-3800, ¶ 22, the Supreme Court of Ohio defined substantial impairment, based upon the plain meaning of the words "substantially" and "impaired" as follows:

"Substantially" has been defined as "in a substantial manner" or "so as to be substantial." Webster's Third New International Dictionary 2280 (2002). To better understand these definitions, we examine the word "substantial," which means "constituting substance" or "not seeming or imaginary." *Id*. "Impaired" means "to make worse" or "diminish in quantity, value, excellence, or strength." *Id*. at 1131.

*See also State v. Samamra*, 2025-Ohio-126, ¶ 10 (9th Dist.). Further, this Court has explained:

a substantial impairment may be proven by the victim's own testimony, allowing the trier of fact to observe and evaluate the victim's ability to perceive the nature of or to control her conduct, and by the testimony of others who have interacted with the victim. The existence of substantial impairment in this context requires a case-by-case determination.

(Internal citation omitted.) *State v. Daniels*, 2011-Ohio-6414, ¶ 6 (9th Dist.).

{¶20} At trial, D.B. testified regarding the events that occurred on February 18, 2023, and February 19, 2023. D.B. explained she ran into Ms. Hutchins, a former co-worker, at Diner 42,

and began having a conversation with her at the bar. Ms. Hutchins was with Mr. Jarrell and four children, but D.B. did not know Mr. Jarrell at that time. D.B. ordered a cheeseburger, three beers, and two shots. D.B. testified she ordered the shots for Ms. Hutchins and Mr. Jarrell as a "friendly gesture." Mr. Jarrell and Ms. Hutchins then invited D.B. to go to Johnny J's for a couple of drinks. D.B. followed Mr. Jarrell and Ms. Hutchins home so they could drop off their children and then followed them to Johnny J's.

{¶21} At Johnny J's, D.B. testified they ordered a drink and then got "kicked out" because Ms. Hutchins got into a fight with the bartender. D.B. indicated she did not finish her beer before they left Johnny J's. Mr. Jarrell then suggested they go to another bar and D.B. said she should not drive. Mr. Jarrell and Ms. Hutchins suggested D.B. ride with them and Ms. Hutchins directed D.B. to sit in the front seat. Mr. Jarrell was driving, D.B. sat in the front seat, and Ms. Hutchins sat in the back seat. D.B. testified she did not know where they were going, but they got on a highway. After drinking something that tasted like Fireball from a water bottle that was missing a "wrapper," in Mr. Jarrell's vehicle, D.B. testified regarding sporadic memories, with large lapses in time, that she could recall from February 18, 2023, and February 19, 2023.

{¶22} D.B. testified she had a memory of being in a hotel room and Mr. Jarrell grabbing her chin and throat hard, then hitting a wall. D.B. also remembered being thrown on the edge of the bed and falling on the floor on her back. D.B. testified she hit her head and back on the wall. D.B.'s next memory is walking out of the police station and seeing her brother at approximately 2 a.m. the next morning. D.B.'s brother came to the police station and took her home. Later that morning, D.B. remembers laying in her bed awake when her daughter came into the room. They started talking and D.B. realized she was "very sore." D.B. testified her neck, ribs, back, head,

and scalp hurt. When asked about vaginal pain, D.B. indicated to Nurse Bailey, "[i]t just feels funny."

{¶23} Prior to going to the hospital at her daughter's behest, D.B. also noticed her phone, wallet, and money were missing. D.B. discovered she was taken to the Super 8 Motel because she saw a charge on her daughter's credit card that had been in her wallet. D.B. also discovered she was at Musketeers Bar through the use of a Google maps app on her daughter's phone that can track a person's location. While at the hospital, D.B. called the police to report this incident.

{¶24} Timothy Baker, a dispatch supervisor with the Richfield Police Department, testified that a 911 call came in at approximately 1 a.m. on February 19, 2023, from the Super 8 Motel in Richfield, Ohio. During that call, an employee of the Super 8 Motel reported there was a woman sitting down and crying and that she had gotten a room with another woman and a man. Further, the employee thought "something happened in the room."

{¶25} William Sprit, a patrol officer with the Village of Richfield Police, testified he was working the early morning hours of February 19, 2023, when he was dispatched to the Super 8 Motel in Richfield, Ohio. At that time, Officer Sprit came in contact with D.B. Officer Sprit described D.B.'s speech as mostly non-decipherable but he understood her to say she was "not okay." Officer Sprit described D.B. as "extremely distressed[,]" and in a "very intoxicated" state. On Officer Sprit's body camera footage, D.B. can be heard saying "[j]ust fucking get them[,]" and "[g]o get them." D.B. also told Office Sprit she could not drive home and that she had been drinking. On the same body camera footage, D.B. is seen lying face-down on the floor in the hallway of the Super 8 Motel and she is barefoot and crying. D.B. is slurring her words and the police officers reminded her several times to "breathe." D.B. kept repeating "I'm stupid" and said she knows she "sounds crazy." The police continue asking D.B. if she knows what happened but

she cannot answer their questions, instead she only tells them bits and pieces of what occurred prior to coming to the Super 8 Motel. D.B. was unable to describe Mr. Jarrell's vehicle and continued crying while the police questioned her on details of what happened. When D.B. thought Mr. Jarrell and Ms. Hutchins were still in the hotel room, she told Officer Sprit "[t]ell them I'm going to fucking kill them."

{¶26} Ryan Kellackey, a detective with the Village of Richfield Police Department, testified he received a telephone call from Officer Shelby Noffsinger, a patrol officer with the Village of Richfield, advising him that D.B. was at the Medina Hospital and was having a sexual assault kit completed. Detective Kellackey went to the Medina Hospital to interview D.B. and instructed Officer Noffsinger to go to the Super 8 Motel and collect any available evidence. Detective Kellackey testified that the hotel room was in disarray, the door to the bathroom was broken, the bed was partially off its foundation, and a clump of brown hair, consistent with D.B.'s hair color, was found on the bed. Further, two bras were found in the room along with several beer bottles.

{¶27} When Detective Kellackey spoke with D.B., she informed him she had "no memory of anything that occurred at the hotel or at the Musketeers Bar in Richfield." D.B. "simply told [Detective Kellackey] that she had visions of being physically assaulted in the room." Detective Kellackey observed cuts and abrasions on D.B.'s head and chin and bruising on her arms and legs. Detective Kellackey also viewed the video footage from Musketeers Bar and testified he paid close attention to whether D.B. showed signs of impairment since she did not remember a large portion of the night. Detective Kellackey described D.B. as continually resting her head on her elbows or her head on the bar, having her head in Mr. Jarrell's lap, leaning onto Mr. Jarrell and/or Ms. Hutchins, and having trouble walking and with balance. On the Musketeers Bar patio, Detective

Kellackey observed D.B. having trouble walking or standing, and when D.B. appeared to be about to fall over, Ms. Hutchins would prevent her from falling and prop her up.

{¶28} Additionally, Detective Kellackey observed Mr. Jarrell "aggressively" standing up and putting his hand down D.B.'s pants up to his wrist for about 21 seconds, where it seems he is manipulating his wrist. The video footage also shows D.B. stumbling and swaying back and forth on her feet. Mr. Jarrell is seen grinding on D.B. from behind and he put his hand down her pants. While this is happening, Ms. Hutchins is seen with her hand down D.B.'s pants in the front. Ms. Hutchins is then seen removing her hand from D.B.'s pants, licking her fingers, and placing her fingers in Mr. Jarrell's mouth. Detective Kellackey indicated D.B. "looks very out of it[,]" and when Mr. Jarrell and Ms. Hutchins stop holding on to her, D.B. falls face first on the ground. Ms. Hutchins bends down, rubs D.B.'s crotch over her pants, and picks her up off the ground. Mr. Jarrell, Ms. Hutchins, and D.B. then leave the patio.

{¶29} Detective Kellackey testified that approximately 30 minutes passed between D.B. falling face first on the ground at the Musketeers Bar patio and walking into the Super 8 Motel. The video from the Super 8 Motel lobby showed D.B. and Ms. Hutchins kissing at the front desk and D.B. was having trouble standing up, was bobbing her head, and as described by Detective Kellackey, "her eyes are closed for a good portion of the time." D.B. handed her wallet to Ms. Hutchins who removed a credit card from the wallet and paid for the room. The video from the Super 8 Motel hallway then shows Mr. Jarrell, Ms. Hutchins, and D.B. walking down the hallway, and D.B. has trouble walking. D.B. hits both the left and right side walls as she walks down the hallway. Detective Kellackey described D.B. as having "heavy impairment[.]"

{¶30} Andrea Dennis, a forensic scientist in the DNA unit of the Ohio Bureau of Criminal Investigation, testified "DNA can be found in every cell in the human body except for

red blood cells." Further, Ms. Dennis explained in forensic work, DNA typically comes from white blood cells, skin cells, and sperm cells. Ms. Dennis testified that Mr. Jarrell's DNA was found on D.B.'s vaginal samples, bilateral neck samples, and bilateral chest and breast swabs from the sexual assault kit.

{¶31} D.B. obviously was substantially impaired while she was at the Musketeers Bar with Mr. Jarrell and Ms. Hutchins, and when the police discovered her face-down, and barefoot, in the hallway at the Super 8 Motel. D.B. was swaying, propping her head up with her elbows on the bar, resting her head on the bar, putting her head in Mr. Jarrell's lap at the bar, holding on to Ms. Hutchins and Mr. Jarrell while they put their hands down her pants from the front and the back, falling on her face on the patio, walking into walls at the motel, slurring her speech, sobbing uncontrollably when the police are attempting to collect information, speaking in an incoherent manner and being abrasive, and being unable to remember large portions of what happened on February 18, 2023, and February 19, 2023, after drinking a substance from a water bottle in Mr. Jarrell's vehicle.

{¶32} Mr. Jarrell, in his brief, admitted to having sexual intercourse with D.B., and the Ohio Bureau of Criminal investigation confirmed Mr. Jarrell's DNA was found inside D.B.'s vagina. Due to D.B.'s substantial impairment, as evidenced by testimony and video footage throughout this incident, Mr. Jarrell knew D.B. could not consent to engaging in sexual activity with him.

{¶33} In viewing this evidence in a light most favorable to the State, the evidence, here, is sufficient for a reasonable trier of fact to conclude Mr. Jarrell is guilty of the crimes of rape, in violation of R.C. 2907.02(A)(1)(c)/(B), and sexual battery, in violation of R.C. 2907.03(A)(2)/(B).

**Manifest Weight**

{¶34} Mr. Jarrell also argues his convictions for rape and sexual battery are against the manifest weight of the evidence because: (1) D.B. was "engaging" in the activities of February 18, 2023 and February 19, 2023; (2) D.B. was walking between bars and ordering alcohol; (3) there was nothing to support that the staff of the Super 8 Motel were "concerned with her behavior;" and (4) D.B. did not indicate to the Richfield Police or jury that she was sexually assaulted.

{¶35} Here, the jury heard testimony from all witnesses, including D.B., and watched videos of police body camera footage, the Musketeers Bar, and the Super 8 Motel. In those videos, D.B. was clearly intoxicated from alcohol or another substance. Even if D.B. was "engaging" with Mr. Jarrell and Ms. Hutchins, as Mr. Jarrell suggests, she was clearly incoherent and substantially impaired. Further, after drinking a substance in Mr. Jarrell's vehicle, D.B. could only remember bits and pieces of what happened to her on February 18, 2023, and February 19, 2023. Because of D.B.'s lapse in memory, it is reasonable that D.B. did not indicate that she was sexually assaulted. Dr. Savitski explained this phenomenon to the jury, as did Nurse Bailey. "This Court will not overturn a conviction on a manifest weight challenge only because the [trier of fact] found the testimony of certain witnesses to be credible." *Gannon*, 2020-Ohio-3075, at ¶ 20 .

{¶36} Indeed, based upon this record, we cannot say this is the exceptional case where the jury clearly lost its way and created such a manifest miscarriage of justice that Mr. Jarrell's convictions for rape and sexual battery must be reversed and a new trial ordered.

{¶37} Accordingly, Mr. Jarrell's second assignment of error is overruled.

III.

{¶38}  For the foregoing reasons, Mr. Jarrell's two assignments of error are overruled.  The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETTY SUTTON
FOR THE COURT

STEVENSON, P. J.
CARR, J.
CONCUR.

APPEARANCES:

ADAM M. VANHO, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.